UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X
                                                                                          :

ADVANCE WATCH CO., LTD.,                               :

                                 Plaintiff,            :

                                                        :            13-CV-8169 (JMF)
                 -v-                                      :
                                                         :            OPINION AND ORDER

ADAM PENNINGTON et al.,                             :

                                 Defendants.   :

------------------------------------------------------------------------X

JESSE M. FURMAN, United States District Judge:

       Advance Watch Company Ltd., doing business as Geneva Watch Group ("Plaintiff" or "Geneva"), brings this action against two former employees, Adam Pennington and Neil Martin (together, the "Individual Defendants"), and their new employer (and Geneva's former supplier), Rico Industries, Inc. ("Rico" and, together with the Individual Defendants, "Defendants"). Plaintiff alleges various claims in connection with the Individual Defendants' departure from Geneva and their alleged transmission of trade secrets to Rico. (Am. Compl. (Docket No. 37)). Pursuant to Federal Rule of Civil Procedure 12(b)(6), Defendants move to dismiss seven of the eight claims in the First Amended Complaint. (Docket No. 38; Mem. Law Supp. Defs' Second Mot. To Dismiss (Docket No. 40) ("Defs' Mem.")). For the reasons stated below, Defendants' motion is GRANTED in part and DENIED in part.

## BACKGROUND

       The following facts, which are derived from the First Amended Complaint unless otherwise noted, are assumed to be true for purposes of this Rule 12(b)(6) motion. *See, e.g.*, *Gonzalez v. Hasty*, 651 F.3d 318, 321 (2d Cir. 2011).

Geneva, a Michigan corporation founded in 1974, is a "global leader in the design, manufacture, and distribution of digital and analog watches and clocks." (Am. Compl. ¶¶ 7, 17). It produces its own proprietary brands and creates timepieces for other brands as well. (*Id.* ¶ 17). In 2009, Geneva entered into an agreement to purchase the assets of Game Time LLC — a New York limited liability company that Pennington had founded ten years earlier. (*Id.* ¶¶ 19, 21-22). Game Time sold watches that were branded with sports team logos affiliated with the National Football League ("NFL") and Major League Baseball ("MLB"), among others. (*Id.* ¶ 19). At the time of the sale, Game Time "was in financial distress," owing approximately $350,000 in member equity to Pennington and to his partner. (*Id.* ¶ 20).

In an Asset Purchase and Sale Agreement dated November 30, 2009 (the "Agreement" or "APA"), Geneva, through its wholly owned subsidiary Game Time Group, LLC, purchased "substantially all the assets from Game Time, including its intellectual property, trade secrets, and goodwill." (*Id.* ¶¶ 21-22).[1] (In 2012, Geneva merged with Game Time Group, LLC, leaving Geneva as the "surviving corporation." (*Id.* ¶ 26).) The Agreement included a Non-Compete Clause stating, in relevant part, that Pennington would not "engage in any activities, carry on or participate in the ownership, management, or control of, or allow . . . his name or reputation to be used in or by, any other present or future business enterprise involved in the sales, import,

---

[1]   "[I]n an abundance of caution," Defendants sought leave to file the APA under seal because it contains a confidentiality clause. (Docket No. 35). By prior Order, the Court granted leave to file the APA under seal temporarily, but deferred decision on whether to keep it sealed and directed the parties to submit letter briefs explaining why sealing would be consistent with the presumption in favor of access to judicial documents. (Docket No. 33 (citing *Lugosch v. Pyramid Co. of Onondaga*, 435 F.3d 110, 119-20 (2d Cir. 2006)). As Plaintiff indicates that it does not object to public filing, and Defendants provide no legal reason to keep the APA sealed (aside from their desire "to avoid any potential claim" by Plaintiff based on the confidentiality clause, a concern that is now moot in light of Plaintiff's position) (Docket No. 35), the APA is hereby unsealed. Defendants shall file a copy of the APA on the docket within one week of this Opinion and Order.

design, marketing, manufacture, distribution and/or license of watches other than on behalf of [Geneva]." (*Id.* ¶ 25 (emphasis omitted) (quoting APA § 7.8(a)(i))). The Non-Compete Clause also required Pennington to "keep secret and retain in strictest confidence . . . all confidential information with respect to the Business . . . , including, without limitation, information with respect to (a) sales figures, (b) loss figures, and (c) customers, clients, suppliers, sources of supply and customer lists." (*Id.* (emphasis omitted) (quoting APA § 7.8(a)(ii))). Finally, to the extent relevant here, the Non-Compete Clause specified that Pennington could "not directly or indirectly, knowingly solicit or encourage to leave the employment of [Geneva], any employee of [Geneva] after [November 30, 2009,] or within one year of the termination of such employee's employment with [Geneva]." (*Id.* (emphasis omitted) (quoting APA § 7.8(a)(iv))).

After acquiring Game Time LLC's assets through the Agreement, Geneva began operating the business as a new division of the company — the Game Time Division ("Game Time") — and Pennington became the division's president. (*Id.* ¶¶ 23, 26, 32). Pennington's employment offer letter stipulated that his "entire work product" would be the "exclusive property of . . . Geneva." (*Id.* ¶ 35). His duties included managing Game Time's licenses and managing the sales force acquired through the asset sale. (*Id.* ¶ 33). He also managed all of the licensor relationships with the sports leagues and Collegiate Licensing Company. (*Id.* ¶ 34). In January 2011, Geneva offered Martin the position of Vice President of Sales pursuant to a written offer letter, which required Martin to assume the "responsibilities of selling Game Time watches." (*Id.* ¶¶ 37, 104). Martin accepted the terms of the offer letter and, in April 2011, began working at Geneva, where he managed "numerous customer accounts." (*Id.* ¶¶ 38-39). Through their employment, Pennington and Martin both had access to the company's "trade secrets and other sensitive, confidential, proprietary, and economically valuable information,"

including customer lists, price lists, contracts and licensing agreements, manufacturing costs, royalty rates, and wholesale and supplier information.  (*Id.* ¶¶ 50-51).

Like other Geneva employees, Pennington and Martin each received an Employee Handbook describing various company policies.  (*Id.* ¶¶ 48-49).  To the extent relevant here, the Handbook included a confidentiality/non-disclosure provision, stating that "employees are prohibited from discussing confidential information, knowledge or data with persons outside the Company without written permission by Geneva" and that "[a]ll information about Geneva, its customers and their affairs" — including, but not limited to customer and vendor lists, financial and pricing information, and product specifications — "is presumed to be confidential information."  (*Id.* ¶ 44).  The Handbook also included provisions relating to the use of Geneva computers and the Internet (specifying that computer and Internet use must be limited to "legitimate company business"), as well as the use of e-mail (specifying that e-mail use must be limited to "company business only").  (*Id.* ¶¶ 46-47).

Plaintiff alleges that, in or about the summer of 2012, Pennington began "discussions with Rico" — then, one of Geneva's suppliers — that ultimately led to Pennington's defection to Rico.  (*Id.* ¶ 56).  Specifically, he "took an unauthorized trip to China," where Geneva's "not readily ascertainable" manufacturers are located, to benefit Rico.  (*Id.* ¶¶ 57-59).  In or about October 2012, shortly after a trip to China, Pennington also solicited Martin to join him in accepting employment from Rico.  (*Id.* ¶¶ 61-62).  On February 7, 2013, Pennington submitted his letter of resignation to Geneva, "suddenly and without warning."  (*Id.* ¶¶ 8, 72). One week later, Martin also resigned.  (*Id.* ¶¶ 9, 73).  Both now work at Rico.  (*Id.* ¶¶ 8-9, 74).  Plaintiff alleges that the Individual Defendants misappropriated Geneva's trade secrets when they went to work at Rico, and encouraged Geneva's licensors to terminate existing exclusive licensing

4

agreements and to license with Rico instead. (*Id.* ¶ 75). More specifically, Plaintiff alleges that throughout the month of February, before and after submitting their letters of resignation (but before their final days of employment at Geneva on February 15 and 20, 2013), Martin and Pennington sent e-mail messages to their own personal e-mail accounts with Geneva's confidential target customer lists, undisclosed licensing opportunities, customer information, confidential watch designs, and purchase lists. (*Id.* ¶¶ 64-70, 72, 73).

Plaintiff claims that, as a result of this conduct, its exclusive licensing contracts to use NFL and MLB logos on sports watches, which expired in March and December 2013, respectively, were not renewed. (*Id.* ¶¶ 140-41, 153). Instead, Rico entered into those license agreements. (*Id.* ¶ 152). Moreover, Plaintiff claims that Rico is now selling at least ten sports watches with designs that are "virtually identical to the unique designs of Geneva's Game Time watches." (*Id.* ¶ 77). Plaintiff claims that, given the typical length of the development cycle for such watches, Rico "would not have [had] time to offer sports watches for sale in late 2013 or early 2014" unless it began work on them before the Individual Defendants resigned from Geneva in February 2013. (*Id.* ¶ 76). In addition, Rico is now publicizing an "ICE" watch brand, similar to Geneva's own "ICE" watch brand. (*Id.* ¶ 78).

Based on Defendants' conduct, Geneva brings eight claims in its First Amended Complaint: (1) unfair competition and false designation of origin under Section 43(a) of the Lanham Act (against all Defendants); (2) violation of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030 ("CFAA") (against the Individual Defendants); (3) breach of contract (against the Individual Defendants); (4) breach of the duty of loyalty (against the Individual Defendants); (5) misappropriation of trade secrets (against the Individual Defendants); (6) tortious interference with contracts (against all Defendants); (7) tortious interference with prospective business

relations (against all Defendants); and (8) unfair competition (against all defendants).  (Am. Compl. ¶¶ 79-162).  Defendants move to dismiss all but the fourth count of the Amended Complaint.  (Defs' Mem.).

## DISCUSSION

### A. Legal Standard

A motion pursuant to Rule 12(b)(6) challenges the sufficiency of the allegations in the complaint. *See ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007).  To survive the motion, the complaint must "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556).  More specifically, the plaintiff must allege sufficient facts to show "more than a sheer possibility that a defendant has acted unlawfully." *Id.*  If the plaintiff has not "nudged [his or her] claims across the line from conceivable to plausible, [the] complaint must be dismissed." *Twombly*, 550 U.S. at 570.

### B. The CFAA Claim

First, Defendants move to dismiss Count Two of the Amended Complaint, which alleges violations of CFAA, 18 U.S.C. § 1030 *et seq*.  (Defs.' Mem. 8-10; *see* Am. Compl. ¶¶ 87-96).  The CFAA provides a cause of action against a person or entity who "intentionally accesses a computer *without authorization* or *exceeds authorized access*, and thereby obtains . . . information from any protected computer."  18 U.S.C. § 1030(a)(2) (emphasis added).  The dispositive question, for purposes of this motion, is whether the statute applies to the so-called faithless or disloyal employee — that is, whether an employee violates the statute if he or she "is

6

authorized in the first instance to access certain information, but then uses that information for an improper purpose. Put differently, the question is whether an employee's *misuse* of an employer's information violates the CFAA where that information was obtained from a computer to which the employee was permitted access." *JBCHoldings NY, LLC v. Pakter*, 931 F. Supp. 2d 514, 521 (S.D.N.Y. 2013). The Second Circuit has not squarely addressed that question. *See, e.g.*, *Amphenol Corp. v. Paul*, 993 F. Supp. 2d 100, 109 (D. Conn. 2014). *But cf. Nexans Wires S.A. v. Sark-USA, Inc.*, 166 F. App'x 559, 563 (2d Cir. 2006) (summary order) (affirming the district court's reading of the CFAA to exclude losses incurred as a result of the plaintiff's misappropriation of proprietary information). The other Courts of Appeals and district courts in this Circuit are divided. *See JBCHoldings*, 931 F. Supp. 2d at 521-22 (citing cases).

This Court does not feel the need to add much more ink to the judicial debate over the scope of the CFAA. Substantially for the reasons stated in Judge Engelmayer's thorough and well-reasoned analysis of the issue in *JBCHoldings*, 931 F. Supp. 2d at 520-27, the Court agrees with the "narrow approach" favored by most district courts within this Circuit. That is, "[w]hen an employee who has been granted access to an employer's computer misuses that access, either by violating the terms of use or by breaching a duty of loyalty to the employer, the employee does not 'exceed authorized access' or act 'without authorization'" within the meaning of the CFAA. *Id.* at 523. In light of that holding, Plaintiff's CFAA claim must be dismissed. The Amended Complaint does not allege that the conduct at issue here occurred after Pennington or Martin left Geneva. (Am. Compl. ¶¶ 50-51, 63-71). Instead, Plaintiff's CFAA claim is based solely on the files that the Individual Defendants sent to their personal e-mail accounts during their final days of employment, when they still had "access" to Geneva's systems. "Such misuse does not state a claim under the CFAA, because a person does not 'exceed[] authorized access'

7

or act 'without authorization' when he misuses information to which he otherwise has access." *Targum v. Citrin Cooperman & Co., LLP*, No. 12-CV-6909 (SAS), 2013 WL 6087400, at *8 (S.D.N.Y. Nov. 19, 2013).

### C.     The Breach-of-Contract Claim

Next, Defendants seek to dismiss the third count of the Amended Complaint, which alleges a breach-of-contract claim against the Individual Defendants. (Defs.' Mem. 11-13; *see* Am. Compl. ¶¶ 97-106). The Amended Complaint alleges that Pennington breached Section 7.8(a)(i) of the APA by "participating in the ownership, management and control of, and allowing his name and reputation to be used in or by Rico in connection with the sales, import, design, marketing, manufacture, and distribution and/or license of watches" (Am. Compl. ¶ 101); breached Section 7.8(a)(ii) of the APA by "disclosing to Rico 'Confidential Seller Information'" (Am. Compl. ¶ 102); and breached Section 7.8(a)(iii) of the Agreement by "knowingly soliciting and encouraging Martin to leave Plaintiff's employ to join Rico" (Am. Compl. ¶ 103). The Amended Complaint alleges that Martin "breached the terms of his Offer Letter requiring him to sell Game Time watches by, among other things, helping Rico develop customers and licensors for a new sports watches group while employed by Geneva." (Am. Compl. ¶ 105).

Defendants' motion with respect to the claim against Pennington is plainly without merit. Defendants argue that Geneva is not a party to the APA, and therefore does not have any rights under the Agreement, because Game Time Group, LLC, the signatory to the Agreement, did not obtain prior written consent. (Defs.' Mem. 11-12). The relevant section of the Agreement, however, provides that it "shall be binding upon and shall inure to the benefit of the parties hereto *and their respective successors and assigns*, provided, however, that no party may assign its rights and obligations hereunder without the prior written consent of the other party hereto."

8

(Pl.'s Mem. Law Opp'n Defs.' Mot. To Dismiss First Am. Compl. ("Pl.'s Mem.") (Docket No. 42) 10 (quoting APA Section 14.8) (emphasis added)). By its terms, that section requires prior written consent only where a party to the Agreement seeks to "assign its rights and obligations." As Plaintiffs note, and Defendants appear to concede in their reply memorandum (*see* Reply Supp. Defs.' Second Mot. To Dismiss (Docket No. 43) ("Defs.' Reply Mem.") 5-6 (arguing only that the breach of contract claim against Martin should be dismissed)), it does not require written consent if, as is the case here, "a party gains rights in the APA through succession." (Pl.'s Mem. 10-11; *see* Am. Compl. ¶ 26 (noting that Geneva merged with Game Time Group LLC in 2012, leaving Geneva as the "surviving corporation")).

By contrast, Defendants' motion with respect to the contract claim against Martin does have merit. As noted, the sole allegation in the Amended Complaint is that Martin "breached the terms of his Offer Letter requiring him to sell Game Time watches." (Am. Compl. ¶ 105). Put simply, however, the Amended Complaint includes no allegations that would plausibly support a conclusion that Martin breached that obligation. It does allege that Martin "help[ed] Rico develop customers and licensors for a new sports watches group while employed by Geneva." (*Id.* ¶ 105). But it does not necessarily — or even plausibly — follow that Martin breached his duty to sell Game Time watches while he was still employed at Geneva. In his memorandum of law, Plaintiff tries to supplement his allegations by contending that Martin also "breached the confidentiality and computer and internet and email usage policies contained in the Employee Handbook." (Pl.'s Mem. 12). It is well established, however, that a plaintiff may not supplement or amend its complaint "by asserting new facts or theories for the first time in opposition to Defendants' motion to dismiss." *Eyeghe v. Thierry*, No. 14-CV-1914 (JMF), 2014 WL 5242605, at *2 (S.D.N.Y. Oct. 15, 2014) (internal quotation marks omitted). Accordingly,

while the breach-of-contract claim against Pennington survives Defendants' motion, the breach-of-contract claim against Martin must be and is dismissed.

**D.      The Tortious-Interference-with-Contract Claim**

Defendants also seek to dismiss the sixth count of the Amended Complaint, which alleges tortious interference with contracts against all Defendants. (Defs.' Mem. 14-16; *see* Am. Compl. ¶¶ 123-38). Under New York law, to prove a claim for tortious interference with contracts, a plaintiff must show "(1) the existence of a valid contract between plaintiff and a third party; (2) the defendant's knowledge of that contract; (3) the defendant's intentional procuring of the breach; and (4) damages." *Foster v. Churchill*, 87 N.Y.2d 744, 749-50 (1996). Here, the Amended Complaint alleges two ways in which Defendants tortiously interfered with contracts. First, Plaintiff alleges that Defendants interfered with Geneva's contracts with its licensors, customers, and suppliers "by soliciting them." (Am. Compl. ¶ 133). Second, Plaintiff claims that Rico "wrongly and unlawfully solicited and caused Pennington and Martin to breach their employment obligations and duty of loyalty to Geneva." (*Id.* ¶ 135).

Plaintiff's claims fail as a matter of law. The fatal flaw with Plaintiff's first theory is that the Amended Complaint does not allege that Defendants procured a breach of any contract. The Amended Complaint, for example, alleges that Defendants "interfered" with the MLB and NFL agreements (Am. Compl. ¶¶ 133-34), but elsewhere it explains that those exclusive license agreements were set to expire in March and December 2013 and were simply not renewed. (Am. Compl. ¶¶ 140-41, 153). Defendants may well have had something to do with that fact, but not renewing a contract is not the same thing as breaching a contract. Plaintiff's second theory, on the other hand, fails for two independent reasons. First, there are no facts alleged in the Amended Complaint that plausibly support the conclusion that Rico was "was aware of or should

10

have been aware of . . . the Restrictive Covenants and Offer Letter." (Am. Compl. ¶ 132). Plaintiff does allege that Rico should have known "by virtue of" the Individual Defendants' "employment at Rico," but it is well established that knowledge of "an implied contractual obligation in all employment contracts not to disclose trade secrets" is not sufficient. *LinkCo, Inc. v. Fujitsu Ltd.*, 230 F. Supp. 2d 492, 496 (S.D.N.Y. 2002). Second, the Amended Complaint does not allege that Rico's "solicitations" were the "but for" cause of the Individual Defendants' breaches of their employment contracts. *See RSM Prod. Corp. v. Fridman*, 387 Fed. App'x 72, 74 (2d Cir. 2010) (summary order). Pennington and Martin may well have intended to breach the terms of their contracts regardless of their relationship with Rico or Rico's alleged inducements. *See, e.g.*, *JBC Holdings NY*, 931 F. Supp. 2d at 535 ("Where a third party acts in concert with someone who already intends to breach their contractual obligations, the third party cannot be said to be the 'but for' cause of that breach."). Accordingly, Plaintiff's tortious-interference-with-contracts claim is dismissed as to all Defendants.

E.    The Tortious-Interference-with-Prospective-Business-Relations Claim

Next, Defendants seek to dismiss the seventh count of the Amended Complaint, which alleges tortious interference with prospective business relations against all Defendants. (Defs.' Mem. 16-18; *see* Am. Compl. ¶¶ 139-58). To prevail on such a claim, New York law requires that Plaintiff prove "(1) that it had a business relationship with a third party; (2) that [Defendants] knew of that relationship and intentionally interfered with it; (3) that [Defendants] acted solely out of malice or used improper or illegal means that amounted to a crime or independent tort; and (4) that [Defendants'] interference caused injury to the relationship with the third party." *Amaranth LLC v. J.P. Morgan Chase & Co.*, 888 N.Y.S. 2d 489, 494 (App. Div. 1st Dep't 2009). If a suit "is based on interference with a nonbinding relationship," as this

11

one is, "the plaintiff must show that defendant[s'] conduct was not 'lawful' but 'more culpable.'" *Carvel Corp. v. Noonan*, 3 N.Y.3d 182, 190 (2004). That is to say, the conduct at issue "must amount to a crime or an independent tort," where "[c]onduct that is not criminal or tortious will generally be 'lawful' and thus insufficiently 'culpable' to create liability for interference with prospective contracts or other nonbinding economic relations." *Id.*

Applying those standards here, the Amended Complaint states a plausible claim against each Defendant. Among other things, Plaintiffs allege that Defendants engaged in unfair competition and misappropriated trade secrets from Geneva, and then used the misappropriated trade secrets to induce the MLB and NFL to refuse to renew their exclusive licensing agreements with Geneva. (Am. Compl. ¶¶ 140-162; *see also id.* ¶¶ 111-22). In light of those allegations, "the 'wrongful means' element is clearly present here, given that the alleged interference occurred by means of separate torts, here trade secret misappropriation and unfair competition." *Faiveley Transp. USA, Inc. v. Wabtec Corp.*, No. 10-CV-4062 (JSR), 2011 WL 1899730, at *10 n.9 (S.D.N.Y. May 13, 2011) (citing *All R's Consulting, Inc. v. Pilgrims Pride Corp.*, No. 06-CV-3601 (DAB), 2008 WL 852013, at *16 (S.D.N.Y. Mar. 28, 2008)).[2]

**F.    Laches**

Last, as something of an afterthought, Defendants seek to dismiss the claims made under the Lanham Act, misappropriation, and unfair competition, on the ground that the traditional equitable doctrine of laches applies to this case and, in turn, bars Plaintiff's claims. (Defs.'

---

[2]    Defendants argue that, at a minimum, the seventh count should be dismissed as to Rico because "Plaintiff has not alleged misappropriation of Secrets [*sic*]" by Rico. (Reply Mem. 8 (citing Am. Compl. Count V). But the Amended Complaint does allege that Rico engaged in unfair competition. (Am. Compl. ¶¶ 159-162). Moreover, although Plaintiff does not bring a misappropriation-of-trade-secrets claim against Rico, the Amended Complaint does allege that Rico itself misappropriated trade secrets and knowingly used such trade secrets to induce the MLB and NFL not to renew their agreements with Geneva. (*Id.* ¶¶ 148-49).

Mem. 18-19; *see* Am. Compl. ¶¶ 79-86, 111-22, 159-62). Their argument, however, borders on frivolous. The doctrine of laches requires that Defendants demonstrate that (1) "plaintiff has delayed unreasonably and inexcusably in prosecuting his rights"; and (2) "plaintiff's delay has resulted in material prejudice to the defendant." *Lemelson v. Carolina Enters., Inc.*, 541 F. Supp. 645, 651 (S.D.N.Y. 1983). Defendants in this case satisfy neither requirement. First, the conduct at issue — the Individual Defendants' resignations from Geneva and allegedly revealing trade secrets to Rico — occurred "suddenly and without warning" in February 2013. (Am. Compl. ¶¶ 8-9, 72-74). Geneva began this action only about nine months later, in November 2013. (Docket No. 1). Nine months do not constitute an unreasonable or inexcusable delay in this case. Indeed, the very case upon which Defendants rely involved patent infringement and trade secret misappropriation claims brought fifteen years after they had accrued. *Lemelson*, 541 F. Supp. at 656-57. Second, Defendants fail to show any material prejudice. They argue perfunctorily that "Defendants cannot be permanently prevented from conducting its business." (Defs.' Mem. 19; Defs.' Reply Mem. 9). But such a grumble does not amount to "material prejudice." Accordingly, Counts One, Five, and Eight of the Amended Complaint survive.

## CONCLUSION

For the reasons stated above, Defendants' motion to dismiss is GRANTED in part and DENIED in part. In particular, Counts Two (the CFAA claim) and Six (the tortious-interference-with-contracts claim) are dismissed in their entirety, and Count Three (the breach-of-contract claim) is dismissed as to Martin. Count Three with respect to Pennington remains, as do Counts One (the Lanham Act claim), Four (the duty-of-loyalty claim, as to which Defendants did not move to dismiss), Five (the misappropriation-of-trade-secrets claim), Seven (the tortious-interference-with-business-relations claim), and Eight (the unfair-competition claim).

The Clerk of Court is directed to terminate Docket No. 38.

SO ORDERED.

Date: October 22, 2014
New York, New York

JESSE M. FURMAN
United States District Judge

14